**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **MICHAEL C. WORSHAM** | * | |
| *Plaintiff* | * | |
| vs. | * | Case 1:20-cv-00008-RDB |
| **DISCOUNT POWER, INC.** | * | |
| *Defendant* | * | |

* * * * * * * * * * * * *

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT**

## BACKGROUND

### Plaintiff Michael C. Worsham

Plaintiff Worsham has lived at his home in Forest Hill, Maryland since 1993, and maintained his residential land line number 410-692-2749 at that address continuously since he first moved there. On July 15, 2006 he entered this land line number into the FCC's National Do Not Call Registry list (hereinafter National DNC list). AC at ¶¶ 1, 44.

### Worsham Suit #1 against DPI in 2017

On January 5, 2017 DPI called Worsham's same residential number 410-692-2749 and delivered a prerecorded voice message robocall similar to the robocalls alleged in this suit. AC at ¶¶ 7-12. This robocall advertised an electric rate discount, required Worsham to press a number to speak to a live sales agent, and failed to transmit a company name as required for Caller ID. AC at ¶¶ 7-10. In 2017 Worsham filed a suit against DPI for this call (Suit #1), small claims Case #901-1386-2017, District Court of Maryland for Harford County. A true copy of this 2017 Complaint was previously filed as ECF 34-1 on July 16, 2020. This small claims case (Suit #1) was settled during July 2017. AC at ¶ 7.

DPI's January 5, 2017 robocall message included the phrase "*This notice concerns a recent letter you received . . .*" regarding an electric rate discount, and also said *"Press 0 to*

*speak to a representative*" followed right away by "*Press 0 to connect*." AC at ¶ 8, ECF 34-1 at p. 3, ¶ 8. DPI's robocall in 2017 did not identify the caller, and after pressing 0 to identify the caller, Worsham was informed that the caller was DPI. *Id.* at ¶¶ 9-10.

The month before Worsham's January 5, 2017 call from DPI, other persons complained at an Internet complaint site of telemarketing calls transmitting the same fake Caller ID name "Power Center" that was transmitted to Worsham on January 5, 2017 in which discount electricity was sold. AC at ¶¶ 9-11, ECF 34-1 at p. 3, ¶ 7.

**<u>Defendant Discount Power, Inc. (DPI)</u>**

DPI is an electric power provider headquartered in Connecticut that engages in telemarketing solicitations directly and/or through agents. AC at ¶¶ 3-6.

Suit #1 made DPI aware of the TCPA, and of the problems with its telemarketers' TCPA compliance, robocall use, identification failures, calling numbers on the DNC list, Caller ID failure, and knew which telemarketer called Worsham on Jan. 5, 2017. *Id*. at ¶ 12.

On April 27, 2018 DPI was sued for making illegal robocalls, in the class action suit *Abramson, et al. v. Discount Power, Inc.*, Case # 3:18-cv-00728 (D. Conn.). AC at ¶ 13.[1] *Abramson* alleged that DPI made robocall solicitations to Abramson during March 2018 using spoofed Caller ID which offered a 15% discount on electricity. *Id.* As a result of both Worsham's Suit #1 in 2017 and the *Abramson* suit in 2018, "DPI had to know that its telemarketers were using robocalls and not complying with the TCPA." AC at ¶ 14.

**<u>Seven calls alleged in the Amended Complaint (AC)</u>**

Worsham alleges that despite his previous 2017 TCPA Suit #1 and settlement, DPI called Worsham's residential land line number 7 times during a five day period during the

[1] The *Abramson* Complaint is publicly available on PACER and also at https://www.classaction.org/media/abramson-v-discount-power-inc.pdf.

middle of November 2019. AC at ¶ 15.

Of the 7 calls identified, Worsham did not answer the first Call#1 on November 11, 2019, the next five Calls #2-6 were robocall solicitations for DPI's discount electric power, and the last Call #7 on Nov. 15, 2019 was a follow up call from the same DPI agent (Joselyn) who spoke with Worsham earlier that same day during DPI's robocall #6 after Worsham pressed 1 to speak to a live agent. *Id.* DPI's five robocalls messages in Calls #2-6 stated:

**<u>Call 2 details</u>:** Call 2 delivered a robocall message in a male voice that said:

> "**Hello. This is an apology call from your electric utility. You got overcharged by your third party supplier. You will be receiving a rebate check along with a 30% discount on your electric and gas bill. Please press one to get your rebate check**."

**<u>Calls 3, 4 and 5 details</u>:** Calls 3-5 all delivered the same robocall message in a female voice:

> **"Hello thank you for being a valued customer of BGE, also known as Baltimore Gas and Electric. The following is an important update regarding your account. Starting this month all current customers who have not missed any payments in the past 6 months will now be eligible for a discount for up to 30% off of their monthly bill. If you would like to check your eligibility, simply press one on your phone now."**

**<u>Call 6 details</u>:** Call 6 delivered a robocall message in a male voice that said:

> "**Hello. This is an apology call from your electric utility. You got overcharged by your third party supplier. You will be receiving a $100 bill adjustment, along with a 40% discount on your electric and gas bill. Please press 1 to adjust $100 in your bill. Please press 1 now**."

AC at ¶ 15. On February 26, 2020 Worsham provided DPI's counsel with audio recordings of all of these robocall messages. On March 2, 2020 Worsham provided counsel with a recording of a more recent post-lawsuit robocall message received on February 22, 2020 to his residential number, which contained the same robocall message as in Call #2 above.

The AC alleges that all seven of DPI's calls transmitted spoofed (fake) Caller ID, which is identified for each call in the Complaint at ¶ 15. The same spoofed Caller ID of 201-

285-8284 was transmitted for 5 of DPI's 7 calls. *Id.* at page 5 (summary list of all 7 calls)[2]. The suit includes other factual allegations, and alleges federal and Maryland TCPA violations arising from those facts. These are detailed as necessary in the discussion of each Count *infra*.

## LEGAL STANDARD FOR A MOTION TO DISMISS

In a Motion to Dismiss under FRCP 12(b)(6) the well plead facts are assumed true, and all doubts and inferences are resolved in the pleader's favor. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint under FRCP 8(a)(2) is only required to provide "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (2007) (citation omitted). Also, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Id.*

When a court reviews the sufficiency of a complaint "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The "allegations of the complaint should be construed favorably to the pleader" and "we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*

"Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and 'that a recovery is very remote and unlikely.' " *Twombly*, 550 U.S. at 556 (citing *Scheuer*, 416 U.S. at 236). Finally, "A

---

[2] Worsham's land line number provider (Armstrong) inserts **SPAM?** into Caller ID for incoming calls if Armstrong's network detects a number it thinks is an unsolicited or "spam" call. Worsham's May 19, 2020 Motion to Compel Armstrong (ECF 26) is still pending.

motion to dismiss pursuant to 12(b)(6) does not generally permit an analysis of potential defenses a defendant may have to the asserted claims." *Wilson v. PL Phase One Operations L.P.*, 422 F. Supp. 3d 971, 981 (D. Md. 2019) (denying motion to dismiss based in a TCPA case on an alleged established business relationship (EBR) defense).

## ARGUMENT

The legal analysis that follows is based on the allegations in the AC, which were well plead within the meaning of FRCP 12(b)(6). Worsham responds in the order of DPI's Motion.

### 1. The AC Does Not Require Proving Use of an Automatic Telephone Dialing System (ATDS), Which Was Properly Alleged.

No Counts in the AC require proving DPI used an automatic telephone dialing system (ATDS) defined by the TCPA at 47 U.S.C. § 227(a)(1) during its telemarketing solicitations.

Count 9 of the AC highlights the difference between the use of automated equipment, and use of an ATDS as defined by the TCPA. The AC clearly alleged the use of automated equipment, and included the transcriptions of all five automated robocalls in ¶ 15, and described how Worsham had to press a digit during the automated robocalls in order to get past the automated robocall message and speak to a live person, who then identified Discount Power as the caller. Based on these automated robocalls, the AC alleged use of both automated equipment and an ATDS in ¶¶ 3, 36, 46 and 62.

Since no Counts (including Count 9) depend on proving the use of an ATDS, it is irrelevant whether an ATDS was even plead at all. DPI's argument on page 5 of its Motion that "the Court must dismiss all claims pleaded under that Section" is an attack on ATDS claims that don't even exist. Worsham's suit against Direct Energy Services, LLC (DES), which DPI cites on page 5, involved calls to Worsham's wireless cell number and different claims which <u>did</u> involve ATDS allegations and claims, and that suit is currently on appeal.

**2. Counts 1 and 5 State a Claim under the federal and Maryland TCPA**

Count 1 under the federal TCPA, and the related Count 5 under the Maryland TCPA, more than adequately alleged that DPI called Plaintiff's residential number that is on the National DNC list in all seven calls.

**A. DPI's continued baseless accusations that Worsham was engaged in the criminal practice of law without a license deserves Rule 11 sanctions.**

Defendant's arguments that the AC fails to state a claim for Counts 1 and 5 are frivolous. Footnote 2 of DPI's Memorandum (ECF 64-1) repeats it and its counsel's Rule 11 violations, and their continued baseless personal attacks on Worsham.

DPI and its counsel continue their completely unfounded arguments that Worsham was engaged in the criminal practice of law in November 2019 when DPI's calls were made and in 2020 (when their lawyer found a Florida clerk's erroneous docket entry) over five years after he had already been disbarred, was using his home residential phone number 410-692-2749 for this illegal law practice, and that he personally published his home number for this law practice with a federal court in Florida.

DPI and its counsel have had over a year to confirm that Worsham did not identify himself as a lawyer in the case in federal court in Florida, and did not practice law after he was disbarred, as they are required to investigate under Rule 11 prior to making such a representation to the Court. The Court should invoke Rule 11 for their continued violations, misrepresentations, and unsupported personal attacks.

Their frivolous argument in footnote 2 is also legally inappropriate and incorrect in a Rule 12(b)(6) Motion to dismiss, because the argument directly contests and disputes the allegations about Worsham's home land line residential number, and in a Motion to dismiss these well plead allegations about the phone number must be accepted as true. Further,

Worsham's June 13, 2021unrebutted Affidavit swears to this number being a residential number at all times, and him not having practiced law since 2014. ECF 67-2 at ¶¶ 1, 18-20.

**B. DPI Mischaracterizes the Allegations in the Amended Complaint**

DPI's other arguments against Count 1 and 5 are also frivolous, include knowing mischaracterizations about the allegations, and again make impermissible arguments in a Rule 12(b)(6) Motion by contesting the allegations rather than accepting them as required. DPI makes these mischaracterizations and frivolous arguments on pages 5-6 of its Motion:

1. "*Plaintiff does not know who initiated the calls at issue in this case*."

   This is false. Worsham clearly not only alleged, but named the caller's identity (DPI), in both the AC and in his recent Affidavit. AC at ¶ 15; ECF 67-2 at ¶¶ 10-17.

2. ". . . *and the allegations make that clear*," is false for the same reasons cited above.

3. "*Plaintiff alleges that calls 2 and 6 came from the recipient's "electric utility," and that calls 3, 4, and 5 came from Baltimore Gas and Electric ("BG&E")*."

   This is a blatantly and knowingly false misstatement of the allegations. Worsham not only never alleged that any calls came from his electric utility or BG&E, but expressly alleged that the calls were made by DPI in the very same paragraph 15 of the AC that DPI cited, which alleged clearly and unambiguously that "Plaintiff alleges he received the following new telemarketing solicitation robocall messages calls without his permission or consent by or on behalf of Defendant." Throughout the AC, DPI is alleged to have made the calls, including in ¶¶ 3-6, 16, 17, 21-24, 26, 27, 31, 32, 36, 39, 47, 48, 51, 54, 55, 65, 67, and 73. The AC also expressly alleged in ¶ 73 the exact <u>opposite</u> of what DPI falsely misstates the AC as alleging:

   > "Defendant's Calls 1-6 violated the TCPA . . . and were all *initiated* (including Call 1 even though it was not answered) to deliver a prerecorded voice message, for the commercial purpose to induce Worsham to switch his electric service provider from being BG&E and induce him to purchase DPI's electric service, and the purpose was

not as the prerecorded messages falsely and misleadingly state to provide a discount or adjustment to a bill, which could not even be done or given since Worsham did not have (and has never had) electric service with DPI, and were certainly not made to "apologize" (Calls 2 and 6)

Worsham has also explained in previous briefing, and now sworn in his Affidavit (ECF 67-2 at ¶¶ 22-23), that BG&E has never made solicitation calls, and never made the specific 30% off, 40% off, and $100 bill adjustment offers in DPI's robocall solicitation Calls #2-6. DPI's argument is patently and knowingly frivolous.

4. "- *he has not alleged a single fact to plausibly claim that DPI in fact initiated the calls*." (Motion at p. 6, top).

This is false as discussed above and as seen in the first half of DPI's very same sentence, where DPI identified how the AC alleged the facts where DPI's sales agents identified themselves as working for Discount Power in Calls #3-6. Additional facts alleged which support that DPI initiated the calls include Worsham speaking to the same DPI agent named Joselyn in Call #7, the same Caller ID being transmitted in 5 of the 7 calls in just five days, and the discount electric power offers being made in the calls, which are consistent with each other, with Discount Power's business model and even its very name, and importantly with the solicitation in Worsham's Suit #1 in 2017 which also offered discount electric power in an illegal robocall message with non-compliant Caller ID made to Worsham's same residential land line phone number.

5. The AC "*is rife with speculation and conjecture and falls well short of meeting the rigorous* ***Iqbal*** *and* ***Twombly*** *pleading standards*." (Motion at p. 6, top).

This generic argument is false, and DPI fails to identify a single example of actual speculation or conjecture in the AC. The AC need not have even plead details such as the verbatim transcription of DPI's robocall messages, or that the callers identified themselves as calling for Discount Power, for the AC to very easily meet the Supreme

Court's pleading standards, and have put DPI on fair notice of what the claim is and the grounds upon which it rests. *Twombly*, 550 U.S. at 555. This is especially true for Counts 1 (and 5), where the claim is simply that Worsham's number on the DNC list was called by the Defendant, a company that had called Worsham before under very similar circumstances. The AC obviously does this. The essence of all of DPI's pointless arguments about Counts 1 and 5 is that "it wasn't us." That is a dispute to raise in their Answer - if it even can legitimately do so - not to try to dispute in a Motion to Dismiss where the numerous allegations that DPI was the caller are accepted as true. Also, it is not a fact that has to be proven in a complaint, only alleged.

6. "*Plaintiff alleges no facts to show that DPI physically placed calls 1-7*." (Motion at p. 6, middle).

This is false for the same reasons discussed above including the identification of DPI and consistent Caller ID transmitted for 5 of the 7 calls. The AC at ¶ 15 alleges some details of the calls with DPI, including for Calls #3-6 that the caller identified the calling company as **Discount Power**, and that the same caller (Joselyn) spoke with Worsham in Call #7 and they discussed DPI's toll fee 877 customer service number.

7. "*In fact, with respect to calls 2-6, the Amended Complaint alleges that entities other than DPI placed the calls (i.e. an 'electric utility' (calls 2 and 6), and BG&E (Calls 3-5))*." (Motion at p. 6, middle).

This is a repeat of the same knowingly false misstatement of what the AC actually alleged, and is the <u>opposite</u> of what ¶ 73 alleged, especially with respect to BG&E. Also, alleging an electric utility called is not entirely inconsistent with alleging that Discount Power called, because DPI is or claims to be a utility.

8. "*With respect to calls 1 and 7, Plaintiff does not allege who placed the calls*." (Motion at p. 6, middle).

This is a repeat of a knowingly false misstatement of the AC. As discussed

*supra* the AC alleges DPI was responsible for and made (or placed) all 7 calls. DPI's failure to leave a message (Call 1), hanging up abruptly without identifying itself (Call #2), or failing to identify itself during its follow up call on November 15, 2019 (Call #7) does not change the numerous allegations in the AC (*see* ¶¶ 3-6, 16, 17, 21-24, 26, 27, 31, 32, 36, 39, 47, 48, 51, 54, 55, 65, 67, and 73) that all of the 7 calls were placed by DPI. DPI's failure to identify itself in some calls is another TCPA/FCC violation (Count 2) and FTC violation (Count 14), not a basis to dismiss Counts 1 or 5.

9. The AC "*alleges in conclusory fashion that '[t]he persons who called Worsham, and who spoke to Worsham, are agents of Defendant*." (Motion at p. 6, bottom).

This is incorrect, as the AC alleged (primarily) in ¶ 15 that the callers in Calls #3-6 identified themselves and the company they were calling for as Discount Power, not that they were someone calling on behalf of Discount Power. *See* ¶ 15, at Call #3 ("I had to ask her several times to get her to finally tell me the company were (*sic*) **Discount Power**"), at Call #4 (". . . she answered that it was **Discount Power**"), at Call #5 ("I then asked her if this was **Discount Power**. She said yes."), and Call #6 ("I then asked if they were (*sic*) **Discount Power**, and he said yes.") (bolding in AC). These allegations establish or at least plead the callers' agency with DPI, where the callers repeatedly expressly identified themselves as calling for DPI, because agency "may be established by express authorization, implicit authorization, or ratification." *Wilson*, 422 F. Supp. 3d at 980 (citing the Restatement (Third) of Agency).

### C. Agency is Irrelevant Under Counts 1 and 5.

DPI's agency arguments (pgs. 6-7) are misplaced and inapplicable to Counts 1 and 5. Count 1 alleges an FCC violation promulgated under § 227(c)(5) of the TCPA, which provides a private right of action for violations of the FCC's rules to "a person who has received more

than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection" (emphasis added), *Wilson*, 422 F. Supp. 3d at 982 ("The TCPA provides a private right of action under subsections b and c."), *Worsham v. Nationwide Ins. Co.*, 138 Md. App. 487, 504 (2001) ("The TCPA reaches not only the entity making the telephone solicitation, but also any entity 'on whose behalf' such calls are made," citing 47 U.S.C. § 227(c)(5) at n. 9, *cert denied*, 365 Md. 268 (2001)).

The regulations prescribed under subsection 227(c) include 47 C.F.R. § 64.1200(c), and § 64.1200(c)(2) alleged in Count 1. For Count 1 under the TCPA's plain language it is irrelevant to the private right of action whether the call was made by DPI's agents or by a contractor. DPI is liable regardless of who made the call. Count 5 arises under the Maryland TCPA, which has its own private right of action at Maryland Commercial Law Art. (CL) § 14-3202(b) that creates an individual right of action for the federal TCPA violation in Count 1.

Whether DPI's relationship with the caller was one of agency or an independent contractor is also irrelevant under Supreme Court non-delegation doctrine precedent. *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 395-96 (1982) (" the doctrine creates an exception to the common-law rule that a principal normally will not be held liable for the tortious conduct of an independent contractor"). Finally, even if agency was relevant, and even if DPI had properly raised it, "the existence and scope of agency relationships are factual matters typically reserved for a jury." *Wilson* at 980, citing *Metco Products, Div. of Case Mfg. Co. v. N.L.R.B.* , 884 F.2d 156, 159 (4th Cir. 1989), *Nationwide Ins. Co*, 138 Md. App. at 503 (Worsham "points out, correctly, that whether an entity acted as an agent or an independent contractor in a particular transaction is a factual question.").

DPI's arguments that Counts 1 and 5 failed to state a claim are all factually meritless and almost entirely knowingly false and frivolous, and deserving of Rule 11 sanctions.

**3. Counts 2 and 6 State Claims under the federal and Maryland TCPA**.

Count 2 under the federal TCPA, and the related Count 6 under the Maryland TCPA, properly alleged a violation of 47 C.F.R. § 64.1200(d)(4) for DPI's failure to implement minimum standards and procedures to provide the required identification of the individual caller, company name, and a contact telephone number or address.

Count 2 (AC at ¶¶ 69-70) alleges:

> Defendant's Calls 1-7 violated the TCPA and FCC regulations at 47 C.F.R. § 64.1200(d)(4), which require instituting minimum standards and procedures that "*A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted.*"

This Court observed less than two years ago that "The United States Court of Appeals for the Fourth Circuit has not addressed whether 47 C.F.R. § 64.1200(d) provides a private right of action." *Wilson*, 422 F. Supp. 3d at 981-982. *Wilson* concluded that:

> What the FCC has prescribed in § 64.1200(b) implements subsection d of the TCPA, which mandates regulations for technical and procedural standards for telephone calls initiated by an automatic telephone dialing system or calls using an artificial or prerecorded voice system; likewise, the requirements of § 64.1200(d) set forth the procedural standards for telemarketers to maintain their own, company-specific, do-not-call lists and, consequently, <u>appear</u> to fall under the aegis of subsection d of the TCPA.

*Id.* at 982 (emphasis added). *Wilson* however did not explain the basis of this hesitant conclusion that § 64.1200(d)'s requirements "<u>appear</u>" to fall under § 227(d) of the TCPA. The only clue is its casting of the § 64.1200(d) requirements as "procedural standards," which matches the title of § 227(d), which is "Technical and procedural standards." Such a casting is incorrect, and places titles over substance, because the numerous do not call-related requirements at § 64.1200(d) are substantive, not merely procedural or technical, and their substance is related directly to do not call lists and privacy under § 227(c) (not § 227(d)).

**A. The FCC regulations at § 64.1200(d) are substantive requirements issued pursuant to 47 U.S.C. § 227(c) and include the private right of action at § 227(c).**

The substantive requirements at 47 C.F.R. § 64.1200(d) are directly related to DNC lists. The FCC authority for these requirements arise from § 227(c) of the statute, not § 227(d).

The FCC regulation at § 64.1200(d) was first enacted in 1992 (it was then codified at § 64.1200(e)). 7 FCC Rcd 8752, 8753 (Oct. 16, 1992) (1992 FCC Order). At that time, a year after the TCPA was first passed in 1991, the FCC found, pursuant to § 227(c)'s mandate, that "the company-specific-do-not-call list … is the most effective and efficient means to permit telephone subscribers to avoid unwanted telephone solicitations." 7 FCC Rcd at 8765, ¶ 23. The FCC "mandate[d] procedures for establishing company-specific do-not-call lists to ensure effective compliance with and enforcement of the requirements for protecting consumer privacy." *Id.* at ¶ 24. The regulation, now found at § 64.1200(d), begins by stating that:

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity.

These procedures "must meet" minimum standards which must be implemented prior to making telemarketing calls. *Id., Cordoba v. DIRECTV, LLC*, 320 F.R.D. 582, 587 (N.D. Ga. 2017) ("[I]f [the procedures in 47 C.F.R. § 64.1200(d)] are not implemented, each call made by a telemarketer constitutes a violation of the TCPA and the FCC regulations[.]"), *United States v. Dish Network, LLC*, 75 F. Supp. 3d 942, 1014 n.21 (C.D. Ill. 2014) ("If Dish now admits that it has not instituted procedures to maintain a proper internal do-not-call list, then all of the 134,295,177 telemarketing calls identified in the 2007–2010 call records violate TCPA and the FCC Rule"), *Nationwide*, 138 Md. App. At 498 ("we agree with Worsham that the FCC's regulations apply during all telephone solicitations, including predicate calls").

The specific provisions following the beginning paragraph of 47 C.F.R. § 64.1200(d)

cited above impose several substantive requirements, including: (1) creating a written policy available upon demand, and for maintaining a DNC list; (2) that "Personnel engaged in any aspect of telemarketing must be informed and trained in the existence of the do-not-call-list;" (3) recording DNC requests and placing names and numbers on the DNC list within 30 days, and establishing liability for sellers for any failures; (4) identifying sellers and telemarketers including the individual caller, the person on whose behalf the call is made, and a phone number or address; (5) applying DNC requests to affiliated entities if reasonably expected by the consumer; and (6) maintaining a record and honoring DNC requests for 5 years, and (7) an exemption for tax-exempt non-profit organizations. 47 C.F.R. § 64.1200(d)(1)-(7).

"Statutory interpretation begins and ends with the text of the statute so long as the text's meaning is clear." *Reeves v. Astrue*, 526 F.3d 732, 734 (11th Cir. 2008). By its terms, § 64.1200(d) clearly applies to "call[s] for telemarketing purposes." The FCC defines "*telemarketing*" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(13). On the other hand, "*telephone solicitation*" is defined as a telemarketing call made <u>without</u> consent or an established business relationship (EBR). 47 C.F.R. § 64.1200(f)(14). In other words, calls encouraging purchase of property, goods or services are always "*telemarketing*." If such calls are made without consent or an "EBR," they become a "*telephone solicitation,*" a subset of *telemarketing.*

This distinction is important, because when the regulation was first implemented, it only required the policies and procedures to be implemented prior to making "*telephone solicitations*." But in 2003, the FCC specifically amended the regulation to apply to any call for "*telemarketing"* purposes. *2003 TCPA Order*, 18 FCC Rcd. 14014 at ¶ 96.

In that same order, the FCC first created the definition of "*telemarketing*" used in the

current regulation. The FCC found this amendment was necessary, in part, because the original version failed to protect the rights of those consumers who did not make a do-not-call request. *Id.* at 142-43 ¶ 91 ("In addition … many … consumers do not even have the opportunity to make a do-not-call request.")[3]. It would make no sense for the FCC to amend § 64.1200(d) to protect those persons who do not have a chance to make a do-not-call request, if it intended for making such a request to be a pre-requisite to a claim under § 64.1200(d).

In its *2003 TCPA Order* the FCC explained why a rule change was needed:

> [T]he company-specific do-not-call approach has not proven ideal as a stand-alone method to protect consumer privacy…. [T]he increase in telemarketing calls over the last decade now places an extraordinary burden on consumers that do not wish to receive telephone solicitations . . . In addition, the widespread use of predictive dialers now results in many "dead air" or hang-up calls in which consumers do not even have the opportunity to make a do-not-call request. Such calls are particularly burdensome for the elderly and disabled consumers. **We believe, however, that the measures adopted elsewhere in this order will enhance the effectiveness of the company-specific list. For example, the adoption of a national do-not-call registry alleviates the concerns of those consumers**, including elderly and disabled consumers that may find a case-by-case do-not-call option particularly burdensome.

*Id.* at ¶ 91 (emphasis added). The FCC is describing above how the company-specific DNC lists, first created in1992, work in tandem with the then-newly created in 2003 national DNC list that Americans are now very familiar with. Both lists were created to protect privacy, and emanated from the same authority in 47 U.S.C. §227(c)(1)(A), discussed further *infra*.

### B. 47 C.F.R. § 64.1200(d) was promulgated under 47 U.S.C. § 227(c).

The preceding section traced the history of 47 C.F.R. § 64.1200(d), simplified below:

| | 1992 | 2003 |
|---|---|---|
| Company-specific do-not-call rules | § 64.1200(e) | § 64.1200(d) |
| National Do-Not-Call registry | Did Not Exist | § 64.1200(c) |

[3] Call #2 in which DPI's agent named "Ryan" abruptly hung up on Worsham is an example of this type of call which the 2003 FCC rule change intended to address. AC at ¶ 15.

The substantive requirements at § 64.1200(d), previously promulgated at § 64.1200(e), are directly related to privacy and DNC lists and related requirements, and like its predecessor at § 64.1200(e), its authority is based on and comes from §227(c).

**(1) The TCPA Statute is Clear.**

The TCPA is clear about the source of the FCC's authority to implement the company-specific DNC requirements at § 64.1200(d), which were previously found at § 64.1200(e). The major TCPA subsection titled "Protection of Subscriber Privacy Rights" requires the FCC to consider "industry-based or company-specific 'do-not-call' systems, and any other alternatives, individually or in combination" as ways to protect consumer privacy. 47 U.S.C. §227(c)(1)(A). This alone is dispositive of the source of the FCC's authority to promulgate § 64.1200(d).

**(2) The FCC is Clear that its Authority is §227(c)**.

The FCC was clear about its authority for implementing § 64.1200(d), starting with its Notice of Proposed Rulemaking in early 1992 which lead to the promulgation of then-§ 64.1200(e) in the *1992 FCC Order* later in October 1992. The FCC quoted §227(c)(1)(A) and identified company-specific DNC lists as one of several compliance approaches. 7 FCC Rcd. 2736, 2742 at ¶¶ 27, 32 (April 17, 1992). The final Order is broken down into parts and subparts. Relevant here, Part III, Subpart B is "Procedures for Avoiding Unwanted Telephone Solicitations to Residences." *1992 TCPA Order* at 8755. In the first paragraph under Subpart B, the FCC notes that its authority for what follows is derived from § 227(c). *Id.* at 8756, ¶ 7. The company-specific do-not-call requirements are found thereunder. *Id.* at 8764-67, ¶¶ 20-24.

The FCC also made clear that it understood its authority for the 2003 amendment was found in § 227(c). In beginning its discussion of the company-specific do-not-call rules, the FCC explicitly referenced adopting "in the *1992 TCPA Order*" the company-specific do-not-call rules it was amending. *2003 TCPA Order*, 18 FCC Rcd. 14014, 2003 FCC LEXIS 3673

at *136, ¶ 86. It identified those rules as being codified then at § 64.1200(e). *Id.* at n. 272.

**C. Federal Courts Agree that § 64.1200(d) came from § 227(c).**

This Court is the only federal court that has issued a reported decision concluding that § 64.1200(d) came from § 227(d), the conclusory *Wilson* opinion discussed *supra.* Numerous other federal courts across the country in both reported and unreported cases have concluded that § 64.1200(d) came from § 227(c) (and not from § 227(d)).

In one of the earlier decisions the Sixth Circuit explicitly found this promulgation:

> the TCPA instructs the FCC to issue regulations "concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). Accordingly, the FCC issued regulations prohibiting "person[s] or entit[ies] [from] initiat[ing] any call for telemarketing purposes to a residential telephone subscriber unless [the] person or entity has instituted [certain listed] procedures for maintaining" a do-not-call list. 47 C.F.R. § 64.1200(d).

*Charvat v. NMP LLC*, 656 F.3d 440, 443-444 (6th Cir. 2011). *Charvat* listed several of the six requirements at § 64.1200(d)(1)-(6), and pointed out that "Subsection (c) of the TCPA also contains a private right of action," thus linking § 64.1200(d) to the private right of action. *Id.*

Federal courts in Florida have found this connection. The Middle District of Florida denied a motion to dismiss a 47 C.F.R. § 64.1200(d) claim, stating that "a violation of section 64.1200(d) is 'the initiation of the phone call without having implemented the minimum procedures.' " *Wagner v. CLC Resorts & Devs., Inc.*, 32 F. Supp. 3d 1193, 1197-98 (M.D. Fla. 2014). The court found that the plaintiff had properly alleged a violation of 47 U.S.C. § 227(c)(5) by alleging that defendant had initiated calls for telemarketing purposes without instituting procedures that complied with the minimum standards. *Id.*; *see also*, *Nece v. Quicken Loans, Inc.*, 292 F. Supp. 3d 1274, 1283 (M.D. Fla. 2018) (not questioning the private right of action for violations of § 64.1200(d)); *Baxter v. VSC LLC*, Case No. 17-cv-1718, 2018 U.S. Dist. LEXIS 41650, *18 (M.D. Fla. Mar. 13, 2018) (refusing to dismiss § 64.1200(d)

claim), *Benzion v. Vivint, Inc.*, Case #12-61826, 2014 U.S. Dist. LEXIS 187275, *15-17 (S.D. Fla. Jan. 17, 2014).

The Northern District of Georgia held that "if [the procedures in 47 C.F.R. § 64.1200(d)] are not implemented, each call made by a telemarketer constitutes a violation of the TCPA and the FCC regulations [and] any person who receives two or more such calls has a private right of action." *Cordoba v. DIRECTV, LLC*, 320 F.R.D. 582, 587 (N.D. Ga. 2017).

Several other cases nationwide have held the same. *See, e.g.*, *Melito v. Am. Eagle Outfitters, Inc.*, Case #14-02440, 2015 U.S. Dist. LEXIS 160349, *14, n.7 (S.D.N.Y. Nov. 30, 2015) (private right of action under § 227(c) for violations of § 64.1200(d)); *Krakauer v. Dish Network, L.L.C.*, 311 F.R.D. 384, 387 (M.D.N.C. 2015) (same); *Cunningham v. Rapid Response Monitoring Servs.*, 251 F. Supp. 3d 1187, 1199-1200 (M.D. Tenn. 2017); *Allard v. SCI Direct*, Inc., 16-cv-1033, 2017 U.S. Dist. LEXIS 107106, *16 (M.D. Tenn. July 10, 2017).

The Maryland Court of Special Appeals also allowed § 64.1200(d) claims, brought in 2001 under § 64.1200(e) before the *2003 TCPA Order* amended the rule's lettering to § 64.1200(d). *Nationwide Ins.*, 138 Md. App. at 491 (remanding Counts 5, 6 and 7 based on violations which alleged failure to train personnel, provide proper identification, and to provide a do-not-call policy on demand).

The most recent and exhaustive analysis of § 64.1200(d) was in *Barrett v. Vivint, Inc.*, Case #2:19-cv-00568-DBB-CMR (D. Utah, May 20, 2020). Worsham attached the relevant portion of the *Barrett v. Vivint* opinion as ECF 34-2. *Barrett* stated that "the plain language of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(d) are consistent ," and concluded that "the internal do-not-call requirement of 47 C.F.R. § 64.1200(d) derives from the TCPA's directive that the FCC adopt regulations to 'protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object' under 47 U.S.C. § 227(c)(1)."

**D. The regulations at § 64.1200(b) came from § 227(d).**

Besides § 64.1200(d) having clearly been promulgated from 47 U.S.C. § 227(c), and not from 47 U.S.C. § 227(d), it is equally clear that it is § 64.1200(b) that came from § 227(d).

The TCPA's technical and procedural standards subsection at 47 U.S.C. § 227(d) grants the FCC authority in three specific areas. These are: (1) § 227(d)(2) (requiring the FCC to set certain technical and procedural standards for fax machines), (2) § 227(d)(3)(A) (requiring the FCC to prescribe technical and procedural standards for artificial or prerecorded voice message systems related to caller identification requirements), and (3) § 227(d)(3)(B) (requiring the FCC to set standards for line seizure limitations for calls made using an autodialer or a prerecorded voice).

A comparison of the language at the FCC's authority at § 227(d)(3)(A) to 47 C.F.R. § 64.1200(b)(1)-(2) readily reveals that § 64.1200(b)(1)-(2) is where the FCC promulgated its technical and procedural standards for artificial or prerecorded voice message systems for caller identification. The first part of the each of § 64.1200(b)(1) and (2) is taken verbatim from § 227(d)(3)(A)(I) and (ii), respectively.

The FCC's authority in § 227(d)(3)(A) is limited to artificial or prerecorded voice messages. There is no authority in § 227(d)(3)(A) for the FCC to issue regulations for telemarketing calls or solicitations that are not made with an artificial or prerecorded voice, and which are made with live sales agents, such as Call #7 alleged in this suit. The regulations at § 64.1200(d) cover and pertain to "any call for telemarketing purposes to a residential telephone subscriber," which includes live sales agent calls, and is thus broader than the limited scope of call types granted to the FCC in § 227(d)(3)(A). The regulations at § 64.1200(d) thus could not have come from § 227(d)(3)(A).

The regulation at § 64.1200(d) is also completely different in nature from the fax

machine, caller identification, and line seizure limitation requirements that Congress directed the FCC to issue at § 227(d). The § 64.1200(d) requirements include a written policy, training of personnel, recording DNC requests, and maintaining DNC lists for 5 years. None of these requirements are included or mentioned anywhere in § 227(d).

Only the requirement to identify sellers and telemarketers at § 64.1200(d)(4) bears any resemblance to the Congressional directive at § 227(d)(3)(A). But again, there is no authority given to the FCC in § 227(d)(3)(A) to create regulations for sellers and telemarketers to identify themselves in live sales calls. Even for artificial or prerecorded voice calls, § 64.1200(d)(4) imposes more requirements than § 227(d)(3)(A), because § 64.1200(d)(4) requires the identification of both the individual caller and the person/entity on whose behalf the call is being made, whereas § 227(d)(3)(A) only requires identification of the person/entity initiating the call. This additional requirement in § 64.1200(d)(4), applicable to all calls, not just artificial or prerecorded voice calls, can only have come from § 227(c), not § 227(d).

**E. *Travel Options* is based on the fatally flawed *Burdge* case which never even considered whether § 64.1200(d) came from § 227(c).**

DPI argues that Counts 2 and 6 do not state a claim, relying on *Worsham v. Travel Options, Inc.*, 2016 U.S. Dist. LEXIS 118744, 2016 WL 4592373 at *7 (D. Md. Sep. 2, 2016). *Travel Options* is an unreported case incorrectly decided then, as the detailed argument above and case law since then demonstrates, and as discussed below. *Travel Options* stated:

> The Court has considered the analysis on this point in the case of *Burdge v. Assn. Health Care Mgmt., Inc.*, No. 1:10-CV-00100, 2011 U.S. Dist. LEXIS 9879, at *7-10 (S.D. Ohio Feb. 2, 2011), and has found it persuasive; thus, the Court concludes Worsham does not possess a private right of action as to an alleged violation of 47 C.F.R. § 64.1200(d)(4).

The fatal flaw with this conclusion is that besides not even considering the detailed history and promulgation of § 64.1200(d) discussed above, the *Burdge* case which *Travel Options* relied

on, considered a different issue. ***Burdge* never even considered whether § 64.1200(d) was issued under § 227(c)**. The relevant portion of *Burdge* stated on page 6 of 14 (attached):

> At base, the question is whether an action for a violation of 64.1200(d)(4) arises under 47 U.S.C. § 227(d) or (b), which boils down to a question of whether the failure of an entity to identify itself and provide its address and phone number is a "technical and procedural" violation.

*Burdge* considered the incorrect issue, and never considered whether § 64.1200(d)(4) was promulgated pursuant to the FCC's authority for DNC lists in 47 U.S.C. § 227(c). *Burdge* created for itself a false dilemma which excluded 47 U.S.C. § 227(c) from consideration. Since § 64.1200(d) clearly was not promulgated pursuant to § 227(b) (which as a side matter was the authority for § 64.1200(b)), it is no surprise that having given itself only one other choice, *Burdge* concluded incorrectly that § 64.1200(d) was issued from § 227(d).

*Burdge* is fatally flawed, having never considered § 227(c). The important upshot is that *Travel Options* also did not consider § 227(c) as it should have. Perhaps sensing this, *Travel Options* (at *7) cited with a *But see* indicator several cases contrary to *Burdge* which had reached the correct conclusion regarding § 64.1200(d) and § 227(c), including *Charvat*, 656 F.3d at 448, and *Drew v. Lexington Consumer Advocacy, LLC*, Case #16-cv-00200-LB, 2016 U.S. Dist. LEXIS 52385, at *16, 2016 WL 1559717 (N.D. Cal. Apr. 18, 2016).

*Wilson*, 422 F. Supp. 3d at 981-2 relied on *Travel Options*, stating: "Judge Bredar's analysis is persuasive and applicable here." However, since Judge Bredar's reliance on *Burdge* was clearly misplaced as just discussed, *Wilson's* conclusion is likewise flawed. Every time this Court has considered this issue, its conclusion has relied on the fatally flawed *Burdge* opinion which never actually considered whether § 64.1200(d) came from § 227(c). Accordingly *Burdge*, *Travel Options*, and *Wilson* are incorrect and should be rejected. No reported case supports them, while reported and unreported cases from the Maryland Court

of Special Appeals to the Sixth Circuit properly recognize that § 64.1200(d) comes from the FCC's authority in § 227(c) and has a private right of action.

For all of these reasons, including: (1) the history of 47 C.F.R. § 64.1200(d), (2) the FCC's statements in its *2003 TCPA Order* promulgating § 64.1200(d), (3) the lack of FCC statutory authority for § 64.1200(d) to have come from § 227(d) for live sales calls, (4) the verbatim one-to-one match of § 64.1200(b) with § 227(d)(3)(A), (5) the mismatch between the substance of § 64.1200(d) with the Congressional directive in § 227(d), (6) not a single reported case agrees with Defendant's position and several reported and unreported federal and state cases agree with Plaintiff's position, and (7) this Court's opinions being askew and awry because they are based on the flawed *Burdge* opinion which literally never even considered the correct issue, this Court must conclude that § 64.1200(d) was derived from § 227(c)(1). Since the regulations issued pursuant to § 227(c)(1) have a private right of action under § 227(c)(5), Worsham has a private right of action for his claims under Counts 2 and 5.

**4. Count 3 States a Claim under the federal TCPA**

Count 3 alleges that Defendant's Calls 1-7 violated the TCPA and FCC regulations at 47 C.F.R. § 64.1601(e)(1), which requires that:

> "*Any person or entity that engages in telemarketing, as defined in section 64.1200(f)(7) must transmit caller identification information . . .*[and] *must include either CPN or ANI, and, when available by the telemarketer's carrier, the name of the telemarketer.*"

DPI (on page 9) again relies on *Travel Options*, and two decisions, Worsham's pending suit against Direct Energy Services, and *Meyer v. Capital Alliance Group*, which both also relied on *Travel Options*, to argue that there is no private right of action for violations of 47 C.F.R. § 64.1601(e)(1). *Travel Options* was incorrectly decided for its conclusion regarding Count 2 as just discussed above, and also for Count 3 as discussed in detail below.

### A. *Travel Options*' Uncertain Conclusion is Incorrect About § 64.1601(e)(1).

*Travel Options* first observed (at *11) that it is "not clear whether a violation of § 64.1601(e)(1) falls within the private right of action granted by subsection b or subsection c."

Then, despite explicitly recognizing that "the FCC's rule in § 64.1601(e)(1) appears to support consumers' enforcement efforts under the TCPA's subsection c," *Travel Options* concluded that § 64.1601(e)(1) did not "create a separate mechanism upon which a consumer can make an actionable claim." *Travel Options* later (at *19-20) leapfrogged without support to the conclusion that "any violation of § 64.1601(e)(1) is a violation of technical and procedural standards under subsection d," which it concluded had no private right of action.

### B. There is a private right of action for Caller ID violations of § 64.1601(e)(1).

The FCC usually does not identify which subsection(s) of the TCPA that its authority to promulgate its TCPA regulations is based on. The basis for TCPA liability for the Caller ID name or number violations therefore requires a close look at the TCPA and its history.

Congress created two private rights of action for violations of the FCC regulations promulgated pursuant to the TCPA, at 47 U.S.C. § 227(b)(3) and § 227(c)(5). The Caller ID requirements in the FCC regulation at 47 C.F.R. § 64.1601(e)(1) directly furthers the goals of both § 227(b)(3) and § 227(c)(5), and was promulgated pursuant to both of these two sections, and applies to both automatically dialed or prerecorded voice calls (aka "robocalls") as well as telemarketing calls from live sales agents.

In 1992, in the FCC's first Report and Order regarding the TCPA, the FCC discussed Caller ID, including possibly requiring a special prefix for telemarketers, but took no action, because the technology was relatively new at the time. However, in its later *2003 TCPA Report*, the FCC revisited the issue, and implemented the Caller ID requirements for telemarketing calls, and promulgated the following relevant section of its regulations:

**47 C.F.R. § 64.1601 - Delivery requirements and privacy restrictions.**

> (e) Any person or entity that engages in telemarketing, as defined in section 64.1200(f)(10) must transmit caller identification information.
>
> > (1) For purposes of this paragraph, caller identification information must include either CPN or ANI, and, when available by the telemarketer's carrier, the name of the telemarketer. It shall not be a violation of this paragraph to substitute (for the name and phone number used in, or billed for, making the call) the name of the seller on behalf of which the telemarketing call is placed and the seller's customer service telephone number. The telephone number so provided must permit any individual to make a do-not-call request during regular business hours.
> >
> > (2) Any person or entity that engages in telemarketing is prohibited from blocking the transmission of caller identification information.
> >
> > (3) Tax-exempt nonprofit organizations are not required to comply with this paragraph.

68 Federal Register 44179, July 25, 2003. This regulation has been in effect unchanged since 2003. This regulation is clearly related to the TCPA and its primary goal for consumer privacy, by both its regulation of telemarketing, and concern for privacy, as stated in the regulations's very title: "Delivery requirements and **privacy restrictions**" (emphasis added).

The FCC made important points in 2003 explaining the need for a new Caller ID requirement: "**Caller ID requirements will improve the ability of consumers to identify and enforce do-not-call rights against telemarketers**." *FCC 2003 Report*, 18 FCC Rcd. 14014 at ¶ 91 (emphasis added). This lawsuit is exactly the enforcement the FCC identified in 2003. Had DPI properly transmitted Caller ID as required, much of its delay and denial about its repeated calls would be eliminated, as would some Subpoena needs. The FCC stated:

> The Commission has determined to require all sellers and telemarketers to transmit caller ID information, regardless of their calling systems." . . . Caller ID allows consumers to screen out unwanted calls and to identify companies that the wish to ask not to call again. . . Caller ID also should increase accountability and provide an important resource for the FCC and FTC in pursuing enforcement actions against TCPA and TSR violators.

*Id*. at ¶ 179 (citation omitted). The TCPA is a private attorney general statute, as this case demonstrates. Caller ID is directly related to private enforcement. The FCC also pointed out:

> As explained above, the TCPA seeks primarily to protect subscribers from unrestricted commercial telemarketing calls. Therefore the Commission has determined not to extend the caller ID requirements to tax-exempt nonprofit organizations. However, the caller ID rules will apply to all other companies engaged in telemarketing, and the existence of an established relationship between the telemarketer and the consumer shall not be an exception to these rules.

*2003 TCPA Report* at ¶ 184. Since the Caller ID requirements at 47 C.F.R. § 64.1601(e)(1) were unambiguously promulgated by the FCC pursuant to its authority under the TCPA, and are directly related to the goals and purpose of the TCPA as just discussed, and since the TCPA provides a private right of action for violations of FCC regulations issued under the TCPA, 47 U.S.C. §§ 227(b)(3) and (c)(5), there is a private right of action for violations of § 64.1601(e)(1).

The *2003 TCPA Report* demonstrates that Caller ID requirements were promulgated to aid consumers frustrated by not knowing who called, and to aid enforcement of the TCPA. Further examination shows that the FCC considered potential liability created by the then-new requirement and established a clear and convincing evidence burden on callers:

> Caller ID information must include either ANI or CPN and, when available by the telemarketer's carrier, the name of the telemarketer. If the information required is not passed through to the consumer, through no fault of the telemarketer originating the call, then the telemarketer will not be held liable for failure to comply with the rules. In such a circumstance, the telemarketer must provide clear and convincing evidence that the caller ID information could not be transmitted.

*2003 TCPA Report* at ¶ 179. The FCC's footnote 653 to the second sentence above showed that the FCC was specifically responding to liability concerns:

> *See* WorldCom Reply Comments at 26 (arguing that requiring caller ID could create an expectation in the minds of consumers that they should always receive the information and that such a regulation creates a situation where companies will be unfairly accused of breaking the law, and as a consequence, face undue litigation and harm to their reputations).

*Id.* at n. 653. The term "liability" is used here in reference to the private right of action that a consumer - referenced in the same sentence, and also in the footnote with respect to consumer litigation - has to enforce the FCC rules for telemarketers under 47 U.S.C. § 227(b)(3) and § 227(c)(5). The promulgation of the FCC's Caller ID regulation in 2003 as a whole indicates that it was enacted pursuant to the FCC's authority under 47 U.S.C. § 227(b) and § 227(c).

As a remedial consumer protection statute, the TCPA should be liberally construed to prevent evasion and to effect its remedial purpose. *Hooters of Augusta, Inc. and Sam Nicholson v. American Global Ins. Co. and Zurich Ins.,*272 F. Supp. 2d 1365 (S.D. Ga. July, 2003) (concluding after reviewing the TCPA's extensive legislative history that the TCPA is a remedial statute); *Western Rim Investment Advisors, Inc. et al. v. Gulf Insurance Co.*, 269 F. Supp. 2d 836, 849-850 (N.D. Tex. June, 2003) (TCPA is a remedial statute); *Jemiola v. XYZ Corp*., 802 N.E.2d 745 (Ohio C.P. Dec. 11, 2003) (as a remedial law the TCPA should be liberally construed to protect the rights and interests of the plaintiff and the general public).

One of the best ways to effectuate the TCPA's purpose is through private enforcement. That is why Congress included two separate private enforcement sections at § 227(b)(3) and § 227(c)(5). The FCC's *2003 TCPA Report* is clear that the Caller ID rule was promulgated to enhance enforcement. This, and the liberal construction afforded to the TCPA, coupled with the FCC's directly addressing liability to consumers as a possibility arising from its then-new Caller ID rule, and the observation that the FCC passed the Caller ID rule for all types of telemarketing calls, and not just for the narrower scope of prerecorded calls covered in the TCPA's technical standards section (§ 227(d)), mandates a conclusion that the correct construction of the TCPA and Caller ID rule at § 64.1601(e)(1) is that private enforcement is permissible through the private rights of action at § 227(b)(3) and § 227(c)(5).

**C. § 64.1601(e)(1) could not come from the TCPA's technical standards at § 227(d).**

It is important to recognize that § 64.1601(e)(1) was promulgated to protect privacy for all calls pursuant to the FCC's authority under 47 U.S.C. § 227(b) and (c). It is equally important to recognize that § 64.1601(e)(1) could not have been promulgated pursuant to § 227(d), the technical standards subsection of the TCPA, because § 227(d) provides no statutory authority for the FCC to issue regulations of any kind for either (1) live telemarketing calls, or (2) Caller ID.

The FCC's Caller ID rule at § 64.1601(e)(1) could not have come from the TCPA's technical standards subsection at § 227(d), as *Travel Options* incorrectly concluded, because there is simply no statutory authority in § 227(d) for the Caller ID rule. The technical standards at § 227(d) only apply to fax machines (not at issue here), and to artificial or prerecorded voice systems. The technical standards do not, and can not, apply to live telemarketing solicitation calls, such as DPI's Call #7 on November 15, 2019 (AC at ¶ 15).

**(1) There is no FCC authority in § 227(d) for live telemarketing calls.**

The FCC regulation at § 64.1601(e)(1) applies to "Any person or entity that engages in telemarketing as defined by [the FCC] . . ." The FCC includes live telemarketing solicitation calls in its definition of *telemarketing*. The technical standards at § 227(d) can and do not apply to live telemarketing solicitations, because the Congressional authority given to the FCC only extends to fax machines, and artificial and prerecorded voice messages. These technical standards could not have been the source of the FCC authority to promulgate § 64.1601(e)(1), because § 64.1601(e)(1) extends to and includes live solicitation calls.

**(2) There is no FCC authority in § 227(d) for Caller ID for ANY calls.**

The words "caller identification" (or ID) are not included anywhere within § 227(d). 47 U.S.C. § 227(d) does not provide the FCC with authority to promulgate regulations related

to Caller ID for ANY calls, including fax machines or artificial or prerecorded voice messages.

The authority given to the FCC in § 227(d)(2) is limited to fax header identification requirements. The FCC's authority in § 227(d)(3) is limited to promulgating regulations for artificial or prerecorded voice messages requiring: (1) identification of the caller at the beginning of the message, (2) identification of the telephone number or address of the caller during or after the message, and (3) that any system automatically release the phone line within 5 seconds after the called party has hung up. § 227(d)(3)(A) and (B). Congress was specific about the technical standards it required, and Caller ID was not included among them.

This is logical, since in 1991 when the TCPA was first passed, Caller ID was not as available as it is now, and even less so in the years leading up to the TCPA's actual passage in 1991. Also, from a technical standpoint, Caller ID transmission is accomplished through a separate system from the system or equipment that delivers an artificial or prerecorded voice.

In summary, there is simply no statutory basis at all to conclude that the Caller ID regulation at § 64.1601(e) was issued pursuant to § 227(d), which addresses other issues.

Defendant's calls all allegedly failed to transmit a name via Caller ID, and possibly a proper number as well, in violation of 47 C.F.R. § 64.1601(e)(1). Thus Count 3 states a claim.

**5. Counts 4 and 8 State a Claim under the federal TCPA and Maryland TCPA**

Count 4 states a claim by alleging that Defendant's Calls 1-6 violated the TCPA at 47 U.S.C. § 227(b)(1)(B), and FCC regulation at 47 C.F.R. § 64.1200(a)(3), which provides that:

> "§ 227(b)(1)(B) - *Prohibitions: It shall be unlawful for any person . . .(B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission."*

Worsham did not answer Call 1, and DPI, the alleged caller, failed to transmit a Caller ID name and failed to leave a message with identifying information as required. The AC

alleged several facts for why Call 1 is a robocall *initiated* by DPI.

First, the Caller ID transmitted in Call 1 was the same exact Caller ID number 201-285-8284 transmitted in Calls 3, 4, 5 and 7 all made just days after Call 1. AC at ¶ 15. Second, during those same Calls 3, 4, 5 and 7, Discount Power was identified as the caller by the sales agents, as well as being identified in Call 6. *Id.* Third, during three of these calls (Calls 3, 4 and 5) with the matching Caller ID, the same exact robocall message was delivered. *Id.* Fourth, during Call 4, DPI's agent gave Worsham their customer service number, 877-334-0097, which still currently answers as "Discount Power." *See* AC at § 15 at Call 4, and Worsham June 13, 2021 Affidavit, ECF 67-2, at ¶ 21.

Calls 2 through 6 were all clearly alleged in the AC at ¶ 15 to deliver a prerecorded voice message to Worsham's number, and Worsham is waiting for the Court to grant an Order to submit a disk of the call recordings formally into the record. Completed delivery of a prerecorded voice message is worse conduct than just the *initiation* of the call, which is what the statute prohibits, so the AC easily met the lower *initiation* pleading standard for Calls 2-6.

For Call 1, since pleading a violation § 227(b)(1)(B) requires only an allegation that the caller "*initiate*" the prohibited call, the pleading standard was clearly met, since it was plead to have reached and connected to Worsham's land line number, and to have transmitted the same Caller ID transmitted in four subsequent calls (Calls 3, 4, 5 and 7) that same week. This provision of the TCPA protects residential privacy by stopping a would be caller from even initiating a call, and not calling and then hanging up or failing to identify the caller or leave a message, as occurred in Call 1, which is a well known and annoying privacy invasion.

For Calls 2 to 6, the transmitted Caller ID and robocall message content was provided both herein *supra* and in ¶ 15 of the AC. Worsham also alleged that 410-692-2749 is his residential number, and that he did not give his prior express permission to be called. AC at

Introduction and ¶¶ 1, 7, 40, 44, and 70 (residential line); ¶¶ 15, 37, 73 (no permission or consent given). Calls 2 and 6 both transmitted locally spoofed Caller ID numbers (410-692-xxxx is the local exchange for Worsham's 410-692-2749 residential number), and both delivered a robocall message for discount electric power, the first half of which was identical in both calls, stating falsely: "**Hello. This is an apology call from your electric utility. You got overcharged by your third party supplier.** . . ". Calls 2, 3, 4, 5 all contained robocall messages offering the same 30% discount on electric power rates and urging the recipient to press 1. Worsham spoke with the same sales agent of DPI named Joselyn in Calls 3, 4, 5, and 7, who identified Discount Power by name in Calls 3-5, and was clearly calling on behalf of Discount Power again in her follow up Call 7.

In summary, DPI is tied and linked to Calls 1-7 (including Calls 1-6 which are at issue in Count 4) several ways: Directly by Discount Power being identified by name (Calls 3 to 6), by the same sales agent Joselyn (Calls 3, 4, 5, and 7), by identical robocall messages (Calls 3, 4, and 5), by the same 30% discount offer (Calls 2, 3, 4, and 5), by the same exact transmitted Caller ID number 201-285-8284 (Calls 1, 3, 4, 5, 7), and by partially identical messages and the use of locally spoofed numbers transmitted (Calls 2 and 6).

These allegations together properly plead a claim for a violation of U.S.C. § 227(b)(1)(B) for Calls 1-6 by DPI. This is true even without invoking the *Twombly* standard which requires the Court to assume that the well plead facts are true, and to resolve all doubts and inferences in the pleader's favor. *Bell Atlantic Corp.*, 550 U.S. at 555 (2007). Accordingly, Count 4 states a claim for Calls 1-6 for violations of § 227(b)(1)(B) for Defendant initiating a prerecorded voice message call without Worsham's prior express consent.

**A. Call 1 "constitutes telemarketing" and is not exempt.**

Defendant's arguments at p. 10-11 of its Motion are frivolous or irrelevant, except for

Call 1, for which its argument is incomplete and incorrect.

For Call 1, the AC alleges *e.g.* at ¶¶ 15 and 73 that Call 1 was initiated and made for a commercial purpose. But because DPI failed to leave any message in Call 1, DPI argues that the call is exempt under 47 C.F.R. ¶ 64.1200(a)(3)(iii), which exempts a call initiated to deliver a prerecorded voice message that "Is made for a commercial purpose but does not include or introduce an advertisement or constitute telemarketing."

This reasoning incomplete and incorrect. The FCC exemption above does not apply to a call made for a commercial purpose if it constitutes telemarketing. As noted *supra,* "*Telemarketing*" is defined broadly at § 64.1200(f)(13) to include "initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." Call 1 was initiated, its commercial purpose was to encourage purchase of goods or services, and the call and its Caller ID was transmitted to Worsham's number. Call 1 is not within the FCC exemption. The flaw in DPI's argument is that although Call 1 did not introduce an advertisement (because DPI left no message), Call 1 did "constitute telemarketing" as defined by the FCC, and thus is not exempted under ¶ 64.1200(a)(3)(iii).

As discussed, Calls 2-6 were alleged not just as having been initiated, but as having delivered prerecorded voice messages, that DPI was identified as the caller in Calls 3-6, and that Call 2's robocall message was partly identical to Call 6's message made just 4 days later.

DPI's arguments about Calls 2-6 are frivolous. Its argument at p. 10 (bottom) indicates that DPI does not even understand ¶ 73 of the AC. ¶ 73 alleges that DPI's robocall messages were made to try to get Worsham to switch his electric service provider away from BG&E, to induce him to purchase DPI's electric service, were false and misleading, and not really made to "apologize." DPI's argument on p. 11 includes a repeat of its knowing mischaracterization

of the allegations, including the frivolous argument that the AC "maintains that calls 3, 4 and 5 came from Baltimore Gas & Electric," which ¶ 73 alleged the opposite of - alleging the calls were misleadingly made to appear as if the call was somehow connected to BG&E. DPI's final argument is irrelevant, since an ATDS is not an element of a claim under § 227(b)(1)(B).

Count 4 under the federal TCPA, and Count 8 under the Maryland TCPA, state claims.

**6. Counts 9, 10 and 11 State Claims under the Maryland TCPA**

Counts 9-11 allege Maryland TCPA violations arising from FCC violations. AC at ¶¶ 78-80. The underlying FCC regulations allegedly violated are failures to: "provide an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request," in violation of 47 C.F.R. § 64.1200(b)(1) (Count 9), "At the beginning of the message, state clearly the identity of the business, individual, or other entity that is responsible for initiating the call" (Count 10), and " During or after the message, state clearly the telephone number . . . of such business, other entity, or individual" (Count 11). The verbatim transcripts of each robocall message in Calls 2 through 6 reveals that the required information and opt out mechanism were missing, and lays the necessary factual predicate for pleading the violations in Counts 9-11 summarized above.

The plain unambiguous language of the Maryland TCPA creates a private right of action for violations of the FCC's regulations at 47 C.F.R. § 64.1200, which is 47 C.F.R. Part 64, Subpart L. Maryland Commercial Law Art. (CL), § 14-3202(b). It also explicitly provides that "each prohibited telephone solicitation and each prohibited practice during a telephone solicitation is a separate violation." *Id.* at § 14-3202(c).

A Maryland court has recognized that "Congress also permitted states to impose more restrictive intrastate requirements for telephone solicitations." *Nationwide*, 138 Md. App. At 494. *Nationwide* also recognized that "states are free to provide their own remedies for

conduct that is not otherwise redressed in a private action under section 227(c)(5)." *Id.* at 502, citing the Maryland Public Utilities Article. The Maryland TCPA adopts the federal TCPA's restrictions without change, and is not more restrictive. Even if it was, the TCPA allows this.

Accordingly the Complaint states a claim for relief in Counts 9, 10, and 11.

Defendant's Motion erroneously confuses a private right of action under the federal TCPA, with the separate private right of action under the Maryland TCPA. There may be no private right of action under the federal TCPA for violations of 47 C.F.R. § 64.1200(b)(1)-(3). But that is irrelevant under the Maryland TCPA, which explicitly creates its own a private right of action for each prohibited practice during a telephone solicitation as a separate violation. Maryland CL at § 14-3202(c). If conduct violates an FCC regulation, the MD TCPA provides its own private right of action, regardless of whether or not the federal TCPA does.

Defendant's final argument (p. 13, top) that "Plaintiff's very own allegations reveal BG&E initiated the calls" is patently frivolous. No message states that it was made by BG&E. The same message in Calls 3, 4 and 5 thank the recipient for being a customer of BG&E - they don't state that they were made by BG&E. They mention BGE in a carefully worded sentence to mislead the call recipient to believe the call has some connection to BG&E. Regardless of what the message said, during Calls 3, 4 and 5, after Worsham pressed 1 to speak to a live agent, he was told in all three calls, and by the same agent of DPI named Joselyn, that the caller was Discount Power, all of which is explicitly stated in the allegation summary for Calls 3, 4 and 5. Further, the AC explains that during Call 3, the first of four calls during which Worsham spoke with the same DPI agent named Joselyn, that Joselyn "avoided identifying the company, and I had to ask her several times to get her to finally tell me the company were Discount Power." AC at ¶ 15. This was emphasized four paragraphs later in the allegation at ¶ 19 that "Defendant instructs its agents, employees and/or contractors to avoid identifying

Defendant, and that if asked to identify Defendant to respond that Defendant is the 'state licensed supplier for BG&E' or similar term that fails to identify Defendant."

For these reasons, DPI's Motion to dismiss Counts 9, 10, and 11 should be denied.

**7. Counts 12 to 17 State Claims under the Maryland TCPA for FTC TSR Violations**

DPI's main argument to dismiss Counts 12-17 is that a cause of action does not exist under the Maryland TCPA for violations of the Federal Trade Commission's (FTC's) Telemarketing Sales Rule (TSR). Defendant is incorrect.

DPI admits at p. 14 that the private right of action under the Maryland TCPA for FTC violations was not even addressed in *Worsham v. Ehrlich*, 181 Md. App. 711 (2004). DPI then confusingly cites *Worsham v. Accounts Receivable Mgmt., Inc.*, 497 Fed. App'x 274, 278 (4th Cir. 2012) as accepting the *Ehrlich* holding. *Accounts Receivable Mgmt.* did not involve FTC violations, so at most it only accepted *Ehrlich* with respect to TCPA/FCC violations. The Maryland state appellate courts have not addressed FTC violations under the MD TCPA.

The Maryland legislature specifically created a cause of action for FTC TSR violations in CL § 14-3201(1). This affirmative **right** of Marylanders is separate and distinct from the private right of action it created for TCPA and FCC violations at CL § 14-3201(2). *Ehrlich's* conclusion that there was no Maryland cause of action for violations of the TCPA was clearly incorrect, but even if it was correct, its stated reasoning (an improper consideration of the Maryland legislature's intent about the clear and unambiguous language of the Maryland TCPA), did not consider and thus does not apply to the FTC's TSR, and the private right of action under the Maryland TCPA for violations of the FTC's TSR.

DPI also discusses an irrelevant $50,000 damages threshold in the FTC's TSR. The AC does not allege a claim under the FTC's TSR or even mention 15 U.S.C. § 6104(a). It alleges claims under CL §§ 14-3201-3202, and its private right of action, for the conduct that violated

the FTC's TSR. The FTC's TSR is only the standard of conduct for the Maryland TCPA.

The remainder of DPI's arguments against Counts 12-17 are primarily variations of its endless mischaracterizations of the AC, and its *ad naseum* false mantra that the AC did not allege that DPI initiated any calls, and (*see* p. 15 for example) that there are "no facts supporting any of the allegations." Facts alleged earlier in a complaint need not be re-alleged later when claims and violations are alleged in formal Counts, as DPI mistakenly believes.

DPI makes a curious argument on pgs. 15-16 that "there is [a] private right of action for a similar violation of the FCC regulation." This is notable because in it, DPI has admitted that there is a private right of action for Counts 9, 3, 2, and 11. DPI's curious argument that these private rights to enforce violations of the FCC regulations means that there is no private right for FTC violations has no basis or logic.

DPI's arguments that the AC did not plead willful or knowing violations is very frivolous. Worsham's 2017 TCPA Suit #1 against DPI was alleged and is a matter of public record, and alone, is enough to make any alleged violations, if proven, willful or knowing violations. DPI's lengthy list on pgs. 17-18 of every allegation in ¶¶ 55-67 of the AC cut and pasted with "No facts alleged; naked assertions" asserted next to each paragraph, is yet another repeat of DPI's ignoring the actual supporting facts alleged earlier in the AC, which were discussed *supra*. Worsham incorporates herein his first Opposition, ECF 34, at pgs. 23-25.

**CONCLUSION**

The Court should deny Defendant's Motion to Dismiss the Amended Complaint.

Respectfully submitted,
/s/ Michael C. Worsham
Michael C. Worsham, Plaintiff, *Pro Se*
1916 Cosner Road
Forest Hill, Maryland 21050
410-557-6192
michael @ magicmichael.net