**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

**MICHAEL C. WORSHAM** *

*Plaintiff* *

vs. *

Case 1:20-cv-00008-RDB

**DISCOUNT POWER, INC.** *

*Defendant* *

* * * * * * * * * * * * *

**PLAINTIFF'S MOTION TO RECONSIDER ORDER DISMISSING COUNTS 2-4 AND 6-17 OF THE AMENDED COMPLAINT**

Plaintiff Michael C. Worsham moves under L.R. 105.10 for reconsideration of, and under FRCP 60(b) for relief from, the Court's July 29, 2021 Order (ECF 75) and accompanying Memorandum Opinion (ECF 74) (Opinion), which dismissed the willful and knowing allegations for Count 1, and dismissed Counts 2-4 and 6-17 of the May 13, 2021Amended Complaint (AC) (ECF 54) with prejudice.

The Court's Opinion contains flaws in its conclusions regarding the actual allegations in the AC, and avoided addressing legal issues squarely raised in Worsham's Opposition to Defendant Discount Power, Inc.'s (DPI) Motion to Dismiss to which DPI failed to provide a substantive Reply. The Court's fact conclusions for dismissing certain Counts directly contradict its own conclusions for Counts 1 and 5 which the Court allowed to proceed. Particularly erroneous is the Court's conclusion that the AC did not allege that DPI's violations in Count 1 were done willfully or knowingly, a decision that appears unprecedented in Telephone Consumer Protection Act (TCPA) case law.

If these errors and dismissals are not corrected, a remand on at least one if not more issues and a second trial will be necessary, including a remand and discovery even just for Count 1, to determine up to treble damages if the alleged violations were done willfully or knowingly under 47 U.S.C. § 227(c)(5).

## Legal Standard

Local Rule 105.10 allows a Motion to Reconsider to be filed no later than 14 days after entry of an Order, except as otherwise provided in FRCP 50, 52, 59 or 60..

FRCP 60(b)(1) provides for relief from a final judgment, order, or proceeding for mistake, inadvertence, surprise, or excusable neglect by any person, which can include legal errors by the court, *Pearson v. Target Corp.*, 893 F.3d 980, 984 (7th Cir. 2018) (Rule 60(b)(1) applies to "errors by judicial officers as well as parties."), *Manning v. Astrue*, 510 F.3d 1246, 1249 (10th Cir. 2007). FRCP 60(b)(3) provides for relief from a judgment for fraud, misrepresentation, or misconduct by an opposing party, *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 818 F.3d 1320, 1328 (Fed. Cir. 2016) (misconduct does not require nefarious intent or purpose), and this portion of Rule 60 is remedial and liberally construed, *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 641 (5th Cir. 2005).

FRCP(b)(6) provides for relief from a judgment for any other reason that justifies relief, if the other specifically enumerated rules do not justify relief. *Pearson v. Target Corp.*, 893 F.3d 980 (7th Cir. 2018), *Wells Fargo Bank, N.A. v. AMH Roman Two NC, LLC*, 859 F.3d 295, 299 (4th Cir. 2017) ("Rule 60(b) also contains a catchall section, which gives a court authority to relieve a party from a judgment for 'any other reason' not articulated in sections (1) through (5), Fed. R. Civ. P. 60(b)(6), but only when the movant demonstrates 'extraordinary circumstances'.").

### 1. The AC clearly and repeatedly alleged that the violations were done willfully or knowingly under the TCPA.

For do-not-call (DNC) list violations under § 227(c), such as alleged in Count 1, the TCPA provides that "If the court finds that the defendant willfully or knowingly violated the

regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available." 47 U.S.C. § 227(c)(5). The TCPA also provides for treble damages for violations of § 227(b) of the statute, for violations such as alleged in Count 4 that DPI initiated calls to Worsham's residential telephone line using a prerecorded voice (robocall) without the prior express consent of the called party. 47 U.S.C. § 227(b)(3).

The threshold for alleging that a defendant's TCPA violations were done willfully or knowingly is low. It only requires alleging that the violations were not accidental, inadvertent, or a result of a mistake, and were the result of intentional conduct.

The AC more than adequately alleged these and other facts that the violations were done willfully or knowingly by DPI, throughout the AC (all bolding emphasis below added):

(1) Allegations that DPI's conduct was intentional.

Intentional conduct is alleged especially in the AC at ¶¶ 5-6 :

¶ 5: "Defendant's call center **intentionally** transmits Caller ID information with spoofed or false numbers, and false/spoofed and/or no name information, in the telemarketing calls."

¶ 6: "Defendant's telemarketing messages **intentionally** do not identify the company, the individual caller, or a company phone number or address."

(2) Alleged past violations and knowledge of DPI.

DPI's past violations and other lawsuits are alleged in the AC at ¶¶ 7-14, including explicitly allegations about its knowledge at ¶¶ 12 and 14:

¶ 12: "As a result of the 2017 lawsuit, **Defendant was aware of the TCPA**, and of problems with its telemarketers' TCPA compliance regarding prerecorded voice messages, identification failures, Caller ID failures, and **was aware that its telemarketers were calling numbers on the national Do Not Call (DNC) list**, were using prerecorded voice messages, and were transmitted false or misleading Caller ID, and knew which telemarketer call on 1/5/2017."

¶ 13 "DPI was sued at least one other time for making illegal robocalls, on April 27, 2018, in the class action suit *Abramson, et al. v. Discount Power, Inc.*, Case # 3:18-cv-00728 (D. Conn.). The *Abramson* suit alleged that DPI made robocall solicitations to Abramson during March 2018 using spoofed Caller ID which offered a 15% discount on electricity."

¶ 14: "As a result of Worsham's 2017 suit, and the 2018 *Abramson* suit, **DPI had to know that its telemarketers were using robocalls and not complying with the TCPA**."

(3) DPI's repeated conduct is alleged in the AC at ¶ 15.

The seven calls alleged in one week period, all made to the same number of Worsham which DPI called years earlier in Suit #1, with the same false/spoofed Caller ID transmitted in five calls (Calls #1, 3, 4, 5, and 7), and the same robocall message delivered in three calls (Calls #3, 4, 5), are allegations of repeated conduct. These allegations are completely inconsistent with conduct that is accidental, inadvertent, or a result of a mistake, and are allegations of intentional conduct.

(4) Alleging DPI's intentional conduct to avoid identification.

¶ 19 "**Defendant instructs its agents, employees and/or contractors to avoid identifying Defendant**, and that if asked to identify Defendant to respond that Defendant is the "state licensed supplier for BG&E" or similar term that fails to identify Defendant."

(5) The AC's explicit allegations of DPI's full awareness of the TCPA, intentional robocall use, and awareness of the calls, leads and calling practices.

¶ 20 "**Defendant is fully aware of the TCPA's requirements**, and **intentionally uses or allows the use of robocalls** and lead-generating telemarketers and associated practices to avoid people like Worsham from identifying it other persons involved until after personal information was provided or confirmed, so that Defendant controls who calls who, and to get around the TCPA's requirements, including precluding people from even making a meaningful or informed do not call request, and ignores DNC requests that are made."

¶ 21 "**Defendant is aware of and approves and ratifies the leads generated through the calls** and the calling practices like those described herein and received by Worsham."

(6) Allegations that DPI was aware the law was being violated.

¶ 25 **Defendant is aware of the fact that any persons that help with various aspects of making calls, are violating the law**, and/or consciously avoids knowing when a reasonable business person would check and find out what is really going on with the marketing.

(7) More explicit allegations that DPI's conduct was intentional.

¶ 29 "**Defendant intentionally**: (1) conspired and aided and abetted to call Plaintiff's and many other numbers despite the numbers being on the national DNC registry, (2) used agents to violate the law, (3) did not adequately identify itself in the calls, (4) called so inaccurate, false or incomplete Caller ID is transmitted, and (5) avoid delivering identifying messages to the voice mail of call recipients like Plaintiff."

(8) Specific allegation that DPI knew it did not have express consent to call.

¶ 38 "**Defendant knew that it did not have** or provide to any telemarketers, lead generators, or call centers, the **prior express consent to call** the persons called by or on behalf of Defendant."

(9) Specific allegations that DPI knew when it called Worsham in 2017 and 2019 that his number was a residential number.

¶ 40 "Defendant targets residences, and homes, and **knew when it called Worsham in both 2017 and 2019** that the number 410-692-2749 was a residential number."

(10) Specific allegations that DPI intentionally participated to solicit Worsham.

¶ 50 "**Defendant intentionally**, personally and substantially **participated to help arrange for the solicitation calls to be initiated** and ultimately delivered to Plaintiff's phone number."

(11) An entire section of the AC plead DPI's intentional, willful and knowing conduct.

Page 9 of the AC was dedicated to pleading DPI's knowledge and awareness, and that the violations were willful and knowing:

¶ 54 "Defendant conspired and aided and abetted others to call Plaintiff and many others in Maryland **knowing that their calls** would be calling into Maryland."

¶ 56 "**Defendant willfully and knowingly ignores the national DNC list** registry."

¶ 58 "**Defendant was aware of actual or potential TCPA violations, through feedback from consumers and call recipients, separate its awareness from Plaintiff's suits.**"

¶ 59 "**Defendant is aware of, and knows and approves of the telemarketing calling patterns and practices** used in any of the calling centers and/or agents or contractors it uses."

¶ 60 "**Defendant intentionally and misleadingly uses the initials and name of BGE**, Baltimore Gas and Electric, in its voice messages, **because it knows the people in Maryland that it targets recognize BGE**, and are more likely to listen to the entire message instead of hanging up."

¶ 63 "**Defendant knew of and ratified the acts and conduct of the persons involved with the calls alleged**, including employees, agents, contractors or others doing the calling, including any used to call Plaintiff, and profited or benefitted by these acts and their ratification."

¶ 64 "**Defendant willfully and knowingly failed to clearly identify itself and the individual callers during the pre-recorded messages** calls, and did not provide the full name of the individual callers, or of any other persons on whose behalf the call was being made."

¶ 66 "**Defendant's violations were done '*willfully*' and '*knowingly*,'** as the term '*willful*' is defined at 47 U.S.C. § 312(f) and 47 U.S.C. § 503(b), and as the term '*knowingly*' is defined in 47 U.S.C. § 223(b)(1), and as both of these terms are interpreted by the FCC."

AC at ¶¶ 5, 6, 12, 13, 14, 15, 19, 20, 21, 25, 29, 38, 40, 50, 54, 56, 58, 59, 60, 63, 64, 66.

The specific 22 paragraphs listed above are not the only ones which support the AC's pleading of willful or knowing conduct. They are just the ones that explicitly allege DPI's knowledge (or awareness), or intentional or willful or knowing conduct, using those specific words. Note that several allegations explicitly plead and link DPI's knowledge or intentional conduct to other related facts which were plead elsewhere. An example of this is ¶ 58, where DPI's knowledge of the TCPA violations was plead and linked to its feedback from consumers and call recipients, and its awareness from Plaintiff's suits. This pleading tracks to one court's conclusion that although "a finding of willfulness does not require bad faith, it does require that the caller "have reason to know, or should have known, that his conduct would violate the

statute." *Krakauer v. Dish Network, L.L.C.*, 311 F.R.D. 384, 387, 2017 WL 2242952 (M.D.N.C. 2017), citing *Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 899-901 (W.D. Tex. 2001); *Maryland v. Universal Elections, Inc.*, 862 F. Supp. 2d 457, 463 & n.7 (D. Md. 2012) (applying *Am. Blastfax* standard), *aff'd on other grounds*, 729 F.3d 370 (4th Cir. 2013); *Adamcik v. Credit Control Servs., Inc.*, 832 F. Supp. 2d 744, 754-55 (W.D. Tex. 2011) (same).

The Court's Opinion on page 14 referenced ¶ 90 of the AC, and then without any discussion concluded in a single sentence that: "Worsham has failed to plead any facts to support his allegations that Discount Power violated the TPCA (*sic*) willfully or knowingly."

Paragraph 90 of the AC alleged for Counts 1 through 4 that "Plaintiff demands $1,500 for each separate violation of the TCPA and/or the FCC's regulations, which includes treble damages for each willful or knowing violation of the TCPA or FCC regulations." If ¶ 90 had been the only paragraph in the AC alleging willful or knowing conduct or violations, the Court's conclusion might possibly have been correct. However, at least 22 paragraphs specifically allege knowing, intentional, willful, and/or knowing conduct, covering every aspect of DPI's telemarketing conduct, and alleges facts for which DPI should have known its conduct would violate the TCPA (such as both Worsham's and Abramson's previous lawsuits). By ignoring these 22 specific paragraphs, and considering only ¶ 90 the Court's conclusion is clearly erroneous.

The Court should reconsider, and then correct its Opinion's conclusion regarding violations allegedly done willfully and knowingly for Counts 1 through 4.

**2. Counts 2 and 6 state a legal claim, for reasons DPI failed to respond to and which the Court did not address in simply relying on its previous conclusion and the *Travel Options* case which never actually addressed the substantive issue.**

Counts 2 and 6 of the AC concerned DPI's failure to fully identify itself in its calls as required, and alleged:

> Defendant's Calls 1-7 violated the TCPA and FCC regulations at 47 C.F.R. § 64.1200(d)(4), which require instituting minimum standards and procedures that "*A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted.*"

AC at ¶¶ 69, 70, 75. In deciding that Counts 2 and 6 fail to state a claim for relief under the FCC regulation at § 64.1200(d)(4), the Court's recent Opinion (ECF 74) simply adopted its earlier decision (in ECF 47) without any further analysis. In doing so, the Opinion did not address or even acknowledge the new arguments in Worsham's July 9, 2021 Opposition (ECF 72), including, *inter alia*, pointing out the fatal flaw with an earlier case of this Court which the Court again relied on, *Worsham v. Travel Options, Inc.*, 2016 WL 4592373, at *7 (Sep. 2, 2016).

*Travel Options*' fatal flaw is relying on *Burdge v. Assn. Health Care Mgmt., Inc.*, Case 1:10-CV-00100, 2011 U.S. Dist. LEXIS 9879, at *7-10 (S.D. Ohio Feb. 2, 2011), a case which **never even considered whether § 64.1200(d) was issued under § 227(c), the TCPA subsection which creates the private right of action for violations of § 64.1200(d)**.

Worsham's Opposition also addressed the one sentence which the Court's recent Opinion (at page 8, bottom) took from *Travel Options*, the assertion that "§ 64.1200(d)(4) is more appropriately viewed as setting procedural standards and, therefore, within the realm of the TCPA's subsection *d*, for which no private right of action exists."

Worsham's Opposition on pages 16-22 explained in fairly exhaustive detail: (1) the history of 47 C.F.R. § 64.1200(d) which demonstrates that those requirements are substantive requirements, and not procedural requirements as the Court concluded, (2) the FCC's statements in its *2003 TCPA Order* promulgating § 64.1200(d), (3) the lack of FCC statutory authority for § 64.1200(d) to have come from § 227(d) for live telemarketing sales calls, (4)

the verbatim one-to-one match of § 64.1200(b) with § 227(d)(3)(A), which is the technical standards subsection of the TCPA which the Court's Opinion is erroneously relying on, (5) the mismatch between the substance of § 64.1200(d) with the Congressional directive in § 227(d), (6) and that no other federal court's reported case agrees with the Court's Opinion or *Travel Options* or *Burdge*, and most reported and unreported federal and state cases agree with Plaintiff's position.

Since filing his Opposition (ECF 72), Worsham has found an additional opinion which recognized a private right of action for § 64.1200(d) violations arising from calls to residential phone lines, *Cunningham v. Matrix Fin. Servs.*, 2021 U.S. Dist. LEXIS 63794 at *43-44 (E.D. Tex., Feb. 12, 2021). *Cunningham* ruled the plaintiff did not have a private right of action, but only because the calls at issue were to plaintiff's cell phone and not to a residential phone line, not because the court found there was no private right of action under § 64.1200(d). *Id.* at *44 ("Taking § 227(c)(5) and § 64.1200(d) together, the private right of action created by TCPA § 227(c)(5) is 'limited to redress for violations of the regulations that concern residential telephone subscribers'—not cell phones.")[1].

The Court's Opinion also did not address that its conclusion puts this Court at odds with the Maryland state appellate court, which recognized a private right of action under the previous numbered section for 47 C.F.R. § 64.1200(d), which was at § 64.1200(e) until 2003. *Worsham v. Nationwide Ins. Co.*, 138 Md. App. 487, 491 (2001) (remanding Counts 5, 6 and 7 brought under former § 64.1200(e) for alleged failures to train personnel, provide proper

[1] Although it does not impact this case, because DPI's calls were to Worsham's landline residential number, *Cunningham's* outright rejection to applying § 64.1200(d) to a cell phone number is incorrect. A cell phone number might qualify as a residential number, depending on how it is used. The FCC codified at 47 C.F.R. § 64.1200(e) allowing wireless cell phone numbers to be part of the national DNC list, which exists to protect residential telephone subscribers' privacy rights. 47 U.S.C. § 227(c)(1).

identification, and provide a do-not-call policy on demand). A true copy of the Complaint in *Worsham v. Nationwide Ins. Co.* is attached as an Exhibit. The Court's decision conflicts with *Nationwide's* holding, which will create disparate results depending on whether a TCPA suit is brought in Maryland state court or this U.S. District Court for the District of Maryland, and encourage forum shopping, such as the removal in the instant suit.

**3. Counts 4 and 8 of the AC clearly alleged that DPI initiated prerecorded voice calls that included or introduced an advertisement and constituted telemarketing.**

The Court's Opinion (p. 10) concluded that the AC did not allege a violation of the TCPA restriction which makes it illegal to "initiate any telephone call to any residential telephone line using an artificial or prerecorded voice without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission." 47 U.S.C. § 227(b)(1)(B).

This conclusion is inexplicable in light of the AC's allegations, and with Worsham's still pending motion to submit an audio disk of actual recordings of the calls that are alleged in the AC. The main reason this suit exists is because Worsham received numerous automated robocalls advertising and soliciting discount electric power services from callers who stated they were Discount Power every time Worsham asked who was calling. *See* AC at ¶ 15, Calls #3-6. The Court states that the AC asserts that "two of the calls stated that the call was from the recipient's 'utility,' and three others were seemingly from Baltimore Gas & Electric." This reads like the interpretation of a person who has never heard a robocall or answered a telemarketing call in their life, but more troublesome, ignores the allegations about (1) the second live sales portion of these very same robocalls where the sales agents identified Discount Power as the caller, (2) the same transmitted Caller ID for 5 of the 7 calls, and (3) paragraph 60, which alleged "Defendant intentionally and misleadingly uses the initials and

name of BGE, Baltimore Gas and Electric, in its voice messages, because it knows the people in Maryland that it targets recognize BGE, and are more likely to listen to the entire message instead of hanging up."

The robocall message at the beginning of Calls #2-6, and the ensuing conversation between Worsham and the sales agent after Worsham pressed "1" are part of the same call. There are not two different callers for each part of the same call, which the Court seems to infer. There is just one caller. The AC clearly and unambiguously plead that this caller was identified as Discount Power in Calls #3-6, allegations which even the Court acknowledged on page 11. There is simply no way to conclude that the AC failed to alleged that Discount Power initiated robocalls #3-6. Any person who received a robocall, and after pressing '1' spoke with a sales person who tried to sell the same service or product mentioned or described in the robocall, and identified the caller as X, would reasonably conclude that the robocall was made by X. Here Discount Power is X. On page 11 the Court's Opinion inserts the word "conclusory" two times in the same sentence, apparently to give its conclusion a patina of logic or legitimacy by insert a key word used in Rule 12(b)(6) decisions.

As for Calls #1 and #2: the Caller ID transmitted for Call #1 matches the same Caller ID transmitted for Calls #3, 4, 5 and 7, making it more than credible to alleged that it was the same caller, Discount Power. As for Call #2, the prerecorded voice robocall message was almost identical to the robocall message in Call #6, and started with the identical and false "apology" statement that the call was from the recipient's electric utility. These message similarities, and Calls #1 and 2 all being received on the same day, and within just four days of all four of the other Calls #3-7 during November 2019, are adequate, non-conclusory facts to allege that Discount Power is the caller. The relevant violation of § 227(b)(1)(B) alleged only requires that the robocall be initiated, not received or delivered, so it is not required for

a robocall to have been heard.

The Court's conclusion that the AC did not adequately allege that Discount Power initiated the robocall messages also contradicts the Court's separate conclusion and decision to permit Counts 1 and 5 to proceed. Every Count is dependent on Discount Power being adequately alleged as the caller. The Court recognized that the AC adequately alleged Discount Power as the caller for Counts 1 and 5. How then can it conclude the opposite regarding the allegations for the other Counts, including Count 4? There is no logic to this contradiction.

The Court's conclusion that the AC did not adequately alleged that Discount Power initiate Calls #1-6 is erroneous and should be reconsidered.

**The AC properly alleged that the robocalls included or introduced advertisements**

The Opinion's other error made in dismissing Count 4 is the conclusion (page 10) that the AC did not allege that the robocalls did not include or introduce an '*advertisement*' or constitute '*telemarketing*' as defined by the TCPA. Again, such a conclusion could only be made by a person has never answered a telemarketing call in their life, and who also ignored the full definition of these terms and case law.

The FCC definition of '*advertisement*' is somewhat self-referential, because it is defined as "any material advertising the commercial availability or quality of any property, goods, or services." 47 C.F.R. 64.1200(f)(1). The robocall messages in Calls #3, 4 and 5 all easily meet this definition. The messages were all identical, and said:

> "**Hello thank you for being a valued customer of BGE, also known as Baltimore Gas and Electric. The following is an important update regarding your account. Starting this month all current customers who have not missed any payments in the past 6 months will now be eligible for a discount for up to 30% off of their monthly bill. If you would like to check your eligibility, simply press one on your phone now.**"

This message in Calls #3-5 very clearly advertises a discount up to 30% for current customers

who have not missed payments for 6 months, and meets the FCC definition of *advertisement*. Note again that these robocall messages do not state that they are from BGE.

The robocall messages in Calls #2 and #6 were almost identical, and contained a false message that the call was from the call recipient's electric utility, followed by an advertisement for a rebate check, and a 30% discount (Call #2) and 40% discount (Call #6) on the call recipient's electric bill:

Call #2: "**Hello. This is an apology call from your electric utility. You got overcharged by your third party supplier. You will be receiving a rebate check along with a 30% discount on your electric and gas bill. Please press one to get your rebate check**."

Call #6: "**Hello. This is an apology call from your electric utility. You got overcharged by your third party supplier. You will be receiving a $100 bill adjustment, along with a 40% discount on your electric and gas bill. Please press 1 to adjust $100 in your bill. Please press 1 now**."

These messages both advertise[2] the commercial availability of quality of property, goods, or services, namely, of a rebate and discount, which the recipient must take action to receive. Note that on November 15, 2019, both types of robocall messages, the misleading "BGE" message (Call #5), and the phony 'apology' message (Call #6), were delivered on the same day. AC at ¶ 15.

Further, during Call #6, the sales agent who Worsham spoke with after hearing the robocall message, delivered an advertisement, which was alleged in part as:

> " . . . He gave a spiel about getting a discount on my monthly bill. I then asked if they were **Discount Power**, and he said yes. He asked for my zip code. I told him 20150. He mentioned a discount up to 30%, and asked if I get my electricity from

---

[2] Websters defines *advertise* as: "1 : to make something known to : notify
2a : to make publicly and generally known advertising their readiness to make concessions
b : to announce publicly especially by a printed notice or a broadcast a poster advertising forthcoming events
c : to call public attention to especially by emphasizing desirable qualities so as to arouse a desire to buy or patronize : promote
(From: www.merriam-webster.com/dictionary/advertise (visited August 11, 2021)).

Delmarva Power. I said no, and he then asked if I had BGE, and I said yes. . ."

AC at ¶ 15, excerpt of summary of Call #6 (bolding in original).

The FCC exemption from the robocall prohibition the Court cited (on page 10) only applies to a call that "does not include or introduce an advertisement or constitute telemarketing." 47 C.F.R. § 64.1200(a)(3)(iii). So even if the robocall message does not explicitly contain an advertisement, the entire call can still be still prohibited if the call included or introduced an advertisement. A call includes both the introductory robocall message and the live sales agent conversation that follows. If either contains an advertisement (or constitutes telemarketing), the robocall is not exempted by the FCC from the TCPA's robocall prohibition at 47 U.S.C. § 227(b)(1)(B).

The robocalls were adequately alleged to include or introduce advertisements.

**<u>The AC properly alleged that the robocall message calls constituted *telemarketing*</u>**

The FCC defines *telemarketing* as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(13). For similar reasons as discussed above demonstrating that the robocalls were not exempt because they included or introduced an advertisement, the calls are not exempt because they meet the definition of telemarketing. Specifically, the introductory robocall messages, and the corresponding live sales agent conversations which followed each message, <u>both</u> separately and independently constituted *telemarketing*.

The only possible exception to the above conclusion is unanswered Call #1, which requires closer examination. Call #1 was initiated, received by Worsham, and made for a commercial purpose. However, since Worsham did not answer Call #1, no robocall message was delivered, and the call in its entirety did not include or introduce an advertisement. So Call

#1 is arguably exempt under the first prong of the FCC exemption at 47 C.F.R. § 64.1200(a)(3)(iii).

However under the second prong of the FCC exemption, unanswered Call #1 does constitute *telemarketing* as defined by the FCC. Call #1 was initiated, since it was received even if not answered. Call #1's purpose was to encourage the purchase or rental of, or investment in, property, goods, or services, at least allegedly based on the four other calls received during the next four days which all transmitted the exact same number 201-285-8284 on Caller ID. AC at ¶ 15. Call #1 was also transmitted to any person, since it was transmitted to Worsham, and transmitted Caller ID information to Worsham's residential phone line.

The Court's Opinion did not cite the content of any of the robocall messages, or any of the ensuing conversations with the live sales agents that were the second part following each robocall for Calls #3-6. It only referred very briefly on page 10 to "a discount or rebate on his already-purchased and paid-for electrical services," ignoring that a discount offer to an existing customer (even if Worsham had actually been one with the caller) is still a discount offer and thus still an advertisement, and ignoring that the 'rebate' was illusory bait at best used to get the call recipient to press '1'.

This led the Court to erroneously conclude (page 10) that the AC did not adequately allege facts for Calls #1-6 to support the claims that these calls included or introduced an *advertisement* or constituted *telemarketing*. The detailed discussion above demonstrates that each of Calls #1-6 plead either or both that the message and/or overall call included or introduced an *advertisement* or constituted *telemarketing*.

**Telemarketing includes any call or message whose purpose is to encourage a purchase**

*Telemarketing* includes a "call or message **for the purpose** of encouraging" a purchase. § 64.1200(f)(13) (emphasis added). A call, or message, does not need to include an

advertisement, or explicitly encourage a purchase, in order to be within the FCC definition of *telemarketing*. A call or message is *telemarketing* as long as **the purpose** is to encourage a purchase. *Telemarketing* is **<u>not</u>** defined as a "call or message which encourages" a purchase.

The Opinion's statement (on page 10) that "Worsham has not alleged any facts to support his claim that the messages encouraged purchase of any products or services" is plainly incorrect with respect to the 30% discount offer in the robocall message delivered in Calls #3, 4 and 5, and is an incorrect and overly restrictive analysis for what *telemarketing* calls cover, in two different ways.

The Opinion's first over-restriction is that the sentence only referred to or considered the introductory prerecorded robocall messages and not the entire calls that these messages were a part of, which is the proper analysis since the definition of *telemarketing* covers calls or messages. The second over-restriction is that the sentence only considered whether the messages encouraged purchases, and not the broader scope of *telemarketing* which includes calls or messages whose **purpose** is to encourage purchases. Worsham's conversations with the live sales agents after the prerecorded messages demonstrate that the **purpose** of the messages and calls was to try to get Worsham to sign up for new electric service with Discount Power (and not for a rebate with his existing utility). The Court's analysis would allow telemarketers and sellers to deliver annoying and invasive robocall messages carefully worded to generate the recipient's interest while avoiding an explicit advertisement or telephone solicitation, which the live sales agent would deliver the recipient is connected to after the message, completely contrary to the intent of the TCPA and § 227(b)(1)(B).

The Court's conclusion that the AC did not plead that any of Calls #1-6 included or introduced an advertisement or constituted *telemarketing* is erroneous - very clearly so for the robocall messages and corresponding live sales conversations in Calls #3-6. This decision

must be reconsidered and corrected.

**The TCPA applies to unanswered calls or calls that do not leave a message**

Regarding unanswered Call #1, Worsham points out that for both Count 4, and also for Count 1 which the Court has allowed to proceed, the TCPA applies to unanswered calls or calls where no message was left. That is because is the initiation of a call to a residential number that triggers liability under 47 U.S.C. § 227(b)(1)(B) (Count 4) and under 47 C.F.R. § 64.1200(c)(2) (Count 1).

*Lucas v. Telemarketer Calling from (407) 476-5680 and Other Telephone Numbers*, S.D. Ohio, August 27, 2013 (Case #1:12-cv-00630)[3] involved calls to a residential phone line, similar to this case. *Lucas* analyzed the TCPA's do not call restriction, which provides that "No person or entity shall **initiate** any telephone solicitation to . . . [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry." 47 C.F.R. § 64.1200(c)(2) (bolding emphasis added). *Lucas* first found that the Magistrate's challenged ruling had erred in concluding "that it was inappropriate to infer that these calls were unlawful solicitations simply because they were made from a given telephone number, especially considering that only two were made." In footnote 6, *Lucas* approved of an inference to link calls which transmitted the same Caller ID and/or same prerecorded message, just as Worsham has plead and argued for Call #1, stating:

> We believe such an inference entirely appropriate. The telephone numbers from which the ten calls to Plaintiff containing a pre-recorded telemarketing message originated were assigned to Defendant Qall Cord on the dates in question. So, too, were the telephone numbers from which the two 'no message' calls originated. Moreover, Plaintiff received calls containing the same prerecorded telemarketing message both before and after the two 'no message' calls. See Second Amended Complaint ¶¶ 18-20, 27 (doc. 20 at 6-8).

[3] A copy of *Lucas* is attached as an Exhibit, and *Lucas* is available at: https://scholar.google.com/scholar_case?case=8450461037548850605&q=Lucas+v.+Telemarketer+Calling&hl=en&as_sdt=6,39&as_vis=1

*Lucas* then cited the FCC definition *telephone solicitation,* which includes "the **initiation** of a telephone call or message for the purpose of encouraging the purchase . . . of property, goods, or services, which is transmitted to any person" 47 C.F.R. § 64.1200(f)(15) (bolding emphasis added). *Lucas* then distinguished this definition's use of "or" rather than "and" as part of its conclusion that:

> Nowhere in these two subsections is an additional requirement that the caller leave a message in order to trigger a violation. Indeed, the definition of 'telephone solicitation' twice specifically references 'initiation of a telephone call or message,' not 'initiation of a telephone call and message.' Moreover, as the Sixth Circuit observed in *Charvat*, the 'regulations in 47 C.F.R. § 64.1200(d) impose minimum procedures for maintaining a do-not-call list that apply to all calls—live or automated—initiated for telemarketing purposes to residential telephone subscribers.' 656 F.3d at 449 (emphasis original). Thus, this Court concludes that a violation occurs upon the initiation of the call, regardless of whether a message is left.

*Lucas* (emphasis added). *Lucas* went on to conclude that "'No message' calls, therefore, are actionable under Ohio as well as federal law," and awarded treble damages under the federal TCPA and statutory damages under Ohio law, for two unanswered calls. The FCC definition of *telemarketing,* which this Court cited in determining whether Count 4 stated a claim, mirrors the definition of *telephone solicitation* applied in *Lucas*, in that both definitions apply to "the **initiation** of a telephone call **or** message." (emphasis added). Thus calls to residential numbers which are unanswered or do not leave a message, such as Call #1, violate the TCPA.

Other courts have held similarly interpreting the restriction under 47 U.S.C. § 227(b)(1)(A) to "make" a call to a cell phone number, effectively equating "make" with "initiate." *Fillichio v M.R.S. Assocs*., 2010 U.S. Dist. Lexis 112780 at *9-10 (S.D. Fla. 2010) ("the prohibition in the TCPA applies to phone calls placed to cellular telephone numbers even if the intended recipient does not answer the calls. It is the mere act of placing the call that triggers the statute."), *Castro v. Green Tree Servicing LLC*, 959 F. Supp. 2d 698, 720 (S.D.N.Y.2013) ("[F]or purposes of Plaintiffs' TCPA claim, it is immaterial whether the

Plaintiffs picked up all of Defendants' calls or whether several of the calls went unanswered."), *King v. Time Warner Cable*, 113 F. Supp. 3d 718, 725 (S.D.N.Y. 2015) ("TWC violated the statute each time it placed a call using its ATDS without consent, regardless of whether the call was answered by a person, a machine, or not at all.").

**4. Counts 12-17 state claims under the Maryland TCPA for violations of the Federal Trade Commission's (FTC's) Telemarketing Sales Rule (TSR).**

The Court's dismissal of Counts 12-17 alleging violations of the Maryland TCPA for underlying conduct with violated the FTC's TSR repeated the same errors in its first Opinion dismissing the case, and is inexplicable given the simplicity of the Maryland TCPA.

Worsham's Opposition to the Motion to Dismiss the AC pointed out on page 34 the private right of action under the Maryland TCPA for FTC violations was not even addressed in *Worsham v. Ehrlich*, 181 Md. App. 711 (2004), and that DPI admitted this at p. 14 pf its Motion. The Maryland state appellate courts have not addressed FTC violations under the MD TCPA.

The Court's Opinion at p. 12 selected language from *Ehrlich* to conclude with no other support that *Ehrlich* interpreted the Maryland TCPA "to only provide a private right of action when a federal action already exists." *Ehrlich* did not say this, and again, never even considered the Maryland TCPA's separate and explicit private right of action for FTC violations. Md. Commercial Law Art. § 14-3201(1) and § 14-3202(b). *Ehrlich* looked to legislative intent and the particular circumstances and timing of the passage of the Maryland TCPA in 2004 at the same time when the Maryland appellate courts were deciding whether Maryland state courts would allow a private actions for TCPA claims. *Ehrlich*, 181 Md. App. at 730 ("Given the above scenario, it is likely that the General Assembly enacted the MDTCPA merely to enable a private right of action **under the TCPA**, not to create new

causes of action."). *Ehrlich's* reasoning, while incorrect, because it improperly considered legislative intent for a statute that is clear and unambiguous, even under its own terms does not apply to the FTC's TSR. There is simply no basis for this Court to have done so.

Worsham respectfully asks the Court, if the Maryland legislature wanted to create a private right of action for violations of the FTC's TSR, just as Worsham asserts in Counts 12-17, what would it have done or written differently, or phrased alternately, what is unclear or missing in the Maryland TCPA so as to not create the private right of action? Additionally, what basis does this Court have to look to the intent of the Maryland legislature to reach its conclusion?

The Court's conclusions that the AC did not plead facts that Discount Power is a "telemarketer" or "seller" as defined by the FTC are even more inexplicable than its similar conclusions regarding the FCC's definitions of *advertisement* and *telemarketing*. That is because the FTC has a broader consumer protection mandate than the FCC, and its definitions are correspondingly broader. For example, "seller" is defined as any person who "**in connection with** a telemarketing transaction, provides . . ." 16 C.F.R. § 310.2(dd) (emphasis added). "Telemarketing" is defined as "**a plan, program, or campaign** which is conducted to induce the purchase of . . ." 16 C.F.R. § 310.2(ff) (emphasis added). The AC alleged DPI was a seller and telemarketer as defined by the FTC. The Court's Opinion on page 13 again resorted to inserting the word "conclusory" several times, which is not accurate regarding the AC's allegations about DPI.

This AC is about consumer laws which are to be liberally construed. The Court should reconsider its dismissal of all six of the AC's FTC-based Counts 12-17.

WHEREFORE the Court should grant this Motion, and reconsider and change its July 29, 2021 Opinion and Order dismissing almost this entire case with prejudice, and should permit Worsham to submit a disk with audio recordings of the telemarketing calls at issue.

Respectfully submitted,

/s/ Michael C. Worsham

Michael C. Worsham, Plaintiff, *Pro Se*
1916 Cosner Road
Forest Hill, Maryland 21050
410-557-6192
michael @ magicmichael.net

**CERTIFICATE OF SERVICE**

On February 3, 2021 this document and any Exhibits were filed for service through the Court's ECF system on all parties of record.

/s/ Michael C. Worsham

Michael C. Worsham